

**SIGNED this 02 day of October, 2007.**

_____
**Marcia Phillips Parsons**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>　　LOUIS PRESTON KNIGHT and<br>　　SHERRY MICHELE KNIGHT,<br><br>　　　　　Debtors. | No. 05-53681<br>Chapter 7 |
| McKEE BUILDERS, INC.,<br><br>　　Plaintiff,<br><br>vs.<br><br>LOUIS PRESTON KNIGHT and<br>SHERRY MICHELE KNIGHT,<br><br>　　Defendants. | Adv. Pro. No. 06-5003 |

## M E M O R A N D U M

APPEARANCES:

　　　　Dean Greer, Esq.　　　　　　　　　　　Dave B. Jordan, Esq.
　　　　Post Office Box 3708　　　　　　　　　Post Office Box 5215
　　　　Kingsport, Tennessee 37664　　　　　Kingsport, Tennessee 37663
　　　　*Attorney for McKee Builders, Inc.*　　　*Attorney for Louis and Sherry Knight*

**MARCIA PHILLIPS PARSONS**
**UNITED STATES BANKRUPTCY JUDGE**

In this adversary proceeding, the plaintiff McKee Builders, Inc. seeks a determination of nondischargeability under 11 U.S.C. § 523(a)(2). The trial of this adversary proceeding was held on September 13, 2007. The record before the court consists of 13 exhibits introduced into evidence, together with the testimony of Jeffrey McKee, the president and sole shareholder of the plaintiff, and debtors Louis and Sherry Knight, the defendants herein. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

On September 23, 2005, Louis and Sherry Knight filed a petition under chapter 7 initiating the underlying bankruptcy case. Subsequently, on January 3, 2006, the plaintiff filed its complaint commencing this adversary proceeding, seeking a denial of discharge under 11 U.S.C. § 727(a)(2)(A), (4), and (5) and a determination of nondischargeability under § 523(a)(2). By order entered August 25, 2007, this court granted in part the debtors' motion for summary judgment, dismissing the § 727(a)(2)(A) and (4) claims. At the close of trial, the plaintiff withdrew its § 727(a)(5) cause of action. Thus, the only issue before the court is the § 523(a)(2) claim.

The parties' contractual relationship began when they entered into a contract on February 28, 2003, for the construction by the plaintiff of a personal residence for the debtors. Article IV of the contract provides:

> The Owners shall pay the Contractor the sum, which is equal to Fifteen percent of the entire construction project. The estimated costs of materials and labor necessary to construct the structure based on the modified Plan N. 2020 drawn by Atlanta Plan Source is $240,500.00. It is understood that this is an estimate and may vary up or down as construction proceeds. It is agreed that the contract price is partially based on certain allowances extended to the owners by the contractor as specified on Addendum I. The owners may adjust these allowances.

(Tr. Exh. 9.) Attached to the contract as Addendum I was the list of allowances for fixtures, etc., as referenced in Article IV.

The parties disagreed at trial as to whether the $240,500 purchase price included the contractual 15% contractor fee. The debtors indicated that it did while McKee stated that the contractor fee was an additional amount. Moreover, the debtors disputed the language in the contract which stated that the $240,500 amount was an estimate. Mr. Knight stated in his deposition

2

that the $240,500 amount was a round figure that McKee put into the contract to get the job rolling while the debtors testified at trial that the quoted price was $212,000 and that McKee placed the higher amount in the contract so that the debtors could obtain a larger construction loan.

The debtors obtained a construction loan from Bank of Tennessee in the amount of $256,860 and construction began in April 2003. As is often the case in residential construction, changes were made to the originally planned structure. Three feet was added to the back of the house to make it wider in order to meet the lender's demands that the house be larger so that an appraisal would justify the construction loan; a bay window was added to the ground floor; dormers were added to the front; and the entire second floor, which originally was only going to be framed in, was finished as a bonus room and a half bath. As to the additional square footage on the back and the bay window, the debtors indicated that these changes were included in the original contract, assertions McKee disputed. It is undisputed that the debtors exceeded their Addendum I allowances. The debtors paid the subcontractors and materialmen directly so they were aware as the construction proceeded that materials and labor were costing more than originally estimated.

In November or December 2003, the debtors began to run out of money. Sometime in December 2003, McKee gave the debtors a job summary that listed the allowance for the various items, the actual cost, and the reason for the overage. According to the summary, the overages totaled $58,458.69.

By letter dated January 23, 2004, the debtors advised plaintiff that they were rescinding and terminating the contract because of "what we consider to be deceitful and fraudulent acts on your part prior to and during the construction of our home." The letter forbade McKee or anyone on his company's behalf from entering onto the property without the debtors' written consent and asked McKee to contact the debtors to negotiate a settlement of what was owed. At this time the construction was almost complete, with the hardwood flooring and tile having already been laid.

The plaintiff ceased work on the residence in response to the letter and on February 9, 2004, filed a notice of lien against the debtors' property. On March 6, 2004, the debtors moved into the residence. Construction was complete at that time except for the yard and landscaping work. Several subcontractors and suppliers remained unpaid, including 84 Lumber Company which was

3

threatening to file its own notice of lien on the residence, and the default in payment to the subcontractors and materialmen was hindering the plaintiff's ability to work on other projects since these debts were in plaintiff's name. And, although Bank of Tennessee had increased the construction loan to $283,500, the bank was refusing to release to the debtors the remaining draw of $23,000 because of the lien on the property and unpaid debts.

In order to resolve the dispute, the debtors and McKee met in the office of the plaintiff's attorney, Christopher Raines, on March 8, 2004. As a result of the meeting, the parties executed that day a handwritten agreement drafted by Raines. In the agreement the debtors agreed to assign the remaining construction loan draw of $23,000 to the plaintiff in partial satisfaction of debts owed to 84 Lumber Company, Customer Gas Services, Sears, Winegar Floor Covering, Dors Johns, and Ralph Hawkins. The debtors further agreed to place the American Lighting debt in their name and to execute a promissory note for the balance due plaintiff in the amount of $16,823.38, less a credit for the American Lighting debt once it was transferred into their name. To generate funds sufficient to pay the note, the debtors agreed to apply for refinancing of the residence within 30 days of the filing of a final deed of trust by the Bank of Tennessee, with refinancing to be complete within 120 days. In return for the foregoing, the plaintiff agreed to release its lien that it had placed on the debtors' residence.

On April 6, 2004, McKee and the debtors met at the Bank of Tennessee to carry out the March 8, 2004 agreement. The bank released the final $23,000 draw, cutting checks directly to 84 Lumber Company, Sears Commercial One, and Winegar & Sons Flooring. McKee executed a release of the lien. The debtors were presented with the note to execute on behalf of the plaintiff but balked at signing it when they saw that it contained an attorney fee provision. When McKee threatened to take back the lien release and the bank threatened to take back the checks to the suppliers, the debtors executed the note in favor of the plaintiff upon assurances by a bank officer that attorney fee provisions were standard in promissory notes. The note was in the amount of $13,434.04, rather than the $16,823.38 amount set forth in the March 8, 2004 agreement because the debtors had placed the American Lighting debt in their names as the agreement contemplated.

4

Rather than a refinancing of the home, the debtors obtained a second mortgage on the home from Bank of Tennessee on May 7, 2004, in the amount of $31,500. After payment of $478.93 in loan charges, the debtors used the proceeds to pay the interest and the first payment on the first mortgage loan, resulting in the net sum of $28,420.72 being distributed to the debtors. With all but about $12,000 of this sum, the debtors over the next six weeks paid amounts owing to General Shale, American Lighting and Customer Gas Service, along with new expenditures to Lowe's, Home Depot, and other miscellaneous entities. With the $12,000 balance, the debtors on July 13, 2004, paid $5,000 to Mr. Knight's mother in payment of a loan that the debtors testified that she had made to them six months previously so that they could pay a vinyl siding obligation. In support of this contention, the debtors submitted a handwritten note dated January 17, 2004, wherein Sharon Knight agreed to loan the debtors $5,000 to be repaid in six months.

On July 30, 2004, the debtors wrote attorney Raines a letter in which they indicated that they did not have the money to pay the note owed to the plaintiff, and referenced a conversation with McKee five days previously in which they had offered to pay plaintiff $6,550 in settlement of the note but which McKee had refused. The debtors indicated in the letter that they had offered this reduced amount because the tile work in their house was substandard and that they had received an $7,355 estimate to repair the problems, a copy of which was attached to the letter.

Subsequently on September 4, 2004, the debtors wrote a second letter to Raines reducing the settlement offer to $2,000. They indicated in the letter that they had agreed to pay the plaintiff the amount specified in the March 8, 2004 agreement because they had assumed that the house had been constructed to standards, but that they had since learned that there was a problem with the hardwood floors in addition to the deficient tile work that would necessitate repair costs. The debtors included with the letter a check in the amount of $60 which they indicated was an interest payment on the note for the period from August 9 to September 9.

The plaintiff rejected both offers from the debtors and commenced suit against them in state court to recover the balance owed under the note. On the eve of trial, the debtors filed for bankruptcy relief, thus staying the state court action.

II.

The dischargeability of debts is governed by 11 U.S.C. § 523, which provides in material part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

The Sixth Circuit Court of Appeals has opined that in order to fall within this provision, a plaintiff must prove: (1) the debtors obtained an extension, renewal, or refinancing of credit through material misrepresentations that they knew were false or that they made with gross recklessness; (2) the defendants intended to deceive the plaintiff; (3) the plaintiff justifiably relied on the debtors' false representation; and (4) the plaintiff's reliance was the proximate cause of his losses. *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). The party seeking a determination of nondischargeability bears the burden of proving the necessary elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991). Further, exceptions to discharge are to be strictly construed against the creditor. *In re Rembert*, 141 F.3d at 281.

The requirement set forth in the preamble to the provision is that there be a debt "for money, property, services, or an extension, renewal, or refinancing of credit." Although the debtors' debt to the plaintiff was initially created by the February 2003 contract and the services performed by plaintiff pursuant to that contract, an extension or renewal of credit occurred when the parties settled their dispute over the construction contract by the debtors executing a note for the balance owed plaintiff, in return for the plaintiff's release of its lien. *See Wolf v. Campbell (In re Campbell)*, 159 F.3d 963, 964 (6th Cir. 1998) (court of appeals held that arrangement whereby creditors agreed to forbear from collection of debt in exchange for debtor's modified repayment terms fell within § 523(a)(2)'s "extension, renewal, or refinancing of credit" language). Thus, the relevant point of reference for determining the nondischargeability of the plaintiff's claim is April 6, 2004, although the events leading up to the note and the release are certainly relevant in this regard.

6

The plaintiff alleges that the debtors obtained plaintiff's release of its lien by falsely representing that they would repay the plaintiff the balance set forth in the note, that the debtors made this misrepresentation with the intent to deceive the plaintiff, that the plaintiff justifiably relied on the false representation, and this reliance was the proximate cause of its loss. Although the debtors deny that any of these elements exist in this case, their trial brief only addressed the first two elements – whether there was a false representation made with the intent to deceive. Moreover, it is clear from the evidence at trial that the plaintiff readily established both justifiable reliance and proximate cause.

Justifiable reliance requires a plaintiff to prove that it actually relied on the debtor's representation and that based on the facts and circumstances known at the time, such reliance was justifiable. *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 767 (Bankr. E.D. Tenn. 2003). Mr. McKee testified that he executed the release of the lien based on the debtors' representation to him that they would pay plaintiff in full from the debtors' second mortgage and that he would not have released the lien but for the debtors' representation. In fact, this testimony was confirmed by the undisputed testimony that when the debtors balked at signing the note because of the attorney fee provision, McKee responded by taking back the executed release. Thus, the plaintiff proved actual reliance. Moreover, the plaintiff also established justifiable reliance as there was nothing from all of the facts and circumstances of the case which would indicate that its reliance was not justified. Mr. McKee testified that the officer with the Bank of Tennessee advised him that it was necessary for plaintiff's lien to be released in order for the debtors to get a second mortgage and Mr. Knight stated in his deposition that the release was necessary for the debtors to obtain a second mortgage. Clearly, in releasing its lien, the plaintiff justifiably relied on the representations that it would be paid from a refinancing or second mortgage.

Similarly, this line of testimony establishes that plaintiff's reliance was the proximate cause of its losses. By releasing its lien, the plaintiff relinquished the only leverage that it had against the debtors. It was understood by both parties that the existence of the lien prevented the debtors not only from obtaining access to the last draw on the construction loan but was also an impediment to obtaining any additional loan. As such, but for the release due to the debtors' promises of payment, the plaintiff would not have suffered loss.

Having determined that the plaintiff has proven both justifiable reliance and causation, the court turns to the crux of this case: whether the debtors falsely represented, with the intent to deceive, that they would repay the plaintiff. As correctly noted in the plaintiff's trial brief, a promise to pay made with a present intention not to perform will satisfy the misrepresentation requirement. *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 711 (Bankr. N. D. Ill. 2004). A debtor entering into a contract with no intent to fulfill the obligation of the contract and who later defaults on the obligations may provide a basis for nondischargeability based on fraud. *Parker v. Grant (In re Grant)*, 237 B.R. 97, 112-13 (Bankr. E.D. Va. 1999). Whether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard, ascertained by the totality of the circumstances. *In re Rembert*, 141 F.3d at 281-82. "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Id*. at 282 (quoting *AT&T Universal Card Servs. v. Ellingsworth (In re Elingsworth)*, 212 B.R. 326, 334-35 (Bankr W.D. Mo. 1997)).

The debtors deny that they executed the promissory note without the intent to pay plaintiff, stating that they were unable to obtain refinancing of their construction loan as contemplated and that they simply ran out of money. The debtors also cite the problems with the flooring and tile in their home, which they attribute to the plaintiff, as an alternative basis for their failure to pay the plaintiff.

However, the court simply does not find the debtors credible in this regard. In January 2004 when the debtors terminated the contract with the plaintiff, the tile and flooring had already been laid, and the debtors were already accusing the plaintiff of fraud and seeking a reduction in the amount owed to plaintiff. Mr. Knight testified that the "tile work was substandard, [and] it never met the level of hardwood floors like [he] asked for from the day it was put in." When the debtors met with Mr. McKee and his attorney on March 8, 2004, to resolve the dispute, the debtors had already moved into the house and had already obtained estimates on March 2, 2004, regarding replacement of the tile and hardwood flooring. The tile estimate was $7,355 and the hardwood estimate was $14,000. Notwithstanding the size of these estimates and that they far exceeded the amount owed to the plaintiff, no reference is made to flooring problems in the March 8, 2004 agreement. Mr. McKee testified that the problems were not even mentioned at the meeting or at the

8

subsequent April 6, 2004 meeting at the bank and that the first he heard about them was in the debtors' July and September letters to plaintiff's attorney after the debtors had already obtained the release from the plaintiff. Mr. Knight's testimony at trial disputed this assertion. He testified that he brought up the flooring problems at the March 8, 2004 meeting, although admittedly he was "pretty light about it," and that he did not ask that this be referenced in the agreement because McKee assured him that he would have the subcontractor correct the problem. However, this testimony is contradicted by Mr. Knight's own deposition testimony when he expressly denied that the problems had been discussed at the March 8, 2004 meeting. Moreover, it is counterintuitive that anyone having estimates of over $20,000 to repair problems that they believed was caused by their contractor would be "pretty light" about the matter. Nor is it logical that the debtors would readily accept McKee's alleged statement that he would have the subcontractor repair the problem because they had already accused him of fraud and forbade him from reentering the property.

As admitted by Mr. Knight in his deposition testimony, the debtors knew that obtaining a release of the last draw on their construction loan and the possibility of obtaining a second mortgage all hinged on the plaintiff's release of its lien. This knowledge, the debtors' desire to obtain more funds, their awareness yet silence about the flooring problems, their past accusations of fraud, and their previous settlement request all lead this court to believe that the debtors agreed to pay plaintiff and executed the note in furtherance of the agreement without the subjective intent to do so. Even construing the evidence most liberally in favor of the debtors, this court is convinced that the debtors signed the note merely to obtain plaintiff's release while knowing that they would later contend the problems with the flooring would provide them a basis to pay plaintiff less than what they promised. The debtors' initial reluctance to execute the promissory note upon reading the attorney fee provision is consistent with this conclusion. It was only when McKee threatened to withdraw the release of plaintiff's lien thus threatening the debtors' ability to obtain more funds that the debtors went forward with executing the note.

The debtors argue in their trial brief that the absence of fraudulent intent is demonstrated by the acts they took in furtherance of the March 8, 2004 agreement: assigning the proceeds of the last draw on the construction loan to pay suppliers; executing the promissory note; applying for and obtaining a second mortgage; and attempting to obtaining refinancing from at least two entities but

9

failing due to the prohibitive costs of refinancing. However, the court is unable to conclude that these acts establish a subjective intent to pay on the part of the debtors. With regard to the payment of the last draw to suppliers, Mr. Knight testified in his deposition that the bank insisted that the checks on the last draw be cut directly to suppliers. Thus, this was an act of the bank rather than the debtors. As to the other acts, all can be attributed to the debtors' desire to obtain more loan proceeds rather than a desire to pay the plaintiff. The execution of the note was a precondition to the withdrawal of the lien that the bank was demanding before it would release the last draw on the construction loan or make any future loans. Mr. Knight testified that he knew that the last draw was insufficient to pay all the costs associated with the house and that he would need additional monies to pay the rest of the suppliers and to do the contemplated landscaping work. Accordingly, the totality of the circumstances in this case belies the debtors' characterization of the acts subsequent to the March 8, 2004 agreement.

Lastly, the court addresses the debtors' assertion that the lack of fraudulent intent is demonstrated by the fact that they simply ran out of money to pay the plaintiff, and that they had advised McKee when they signed the promissory note that the plaintiff would be the last paid, testimony that McKee denied. Again, the court does not find the debtors credible in this regard. As previously noted, the lien was the only leverage that the plaintiff had. It is highly unlikely that the plaintiff would have gone forward with the release if Mr. Knight had in fact made this statement, especially since McKee had threatened to walk when the debtors balked at signing the note. As to the contention that the debtors simply ran out of money due to their inability to refinance, the evidence suggests to the contrary that the debtors could have repaid the plaintiff but refused to do so consistent with their long-standing belief that it should be paid a lesser sum due to the flooring problems. According to the deposition testimony of attorney Raines, at the time of the March 8, 2004 meeting, it was discussed that a total of $42,365 remained owing on the debtors' home, including the $12,000 balance owed to the plaintiff for contractor fees. There is no indication that the debtors advised Raines about the $5,000 owing to Mr. Knight's mother and in fact, Mr. Knight testified that they did not tell McKee about this obligation. It was known at the time that the $23,000 balance on the construction loan would be insufficient to pay all that was then owed and that the debtors would need to obtain refinancing or a second loan to pay everyone. Adding the

10

$23,000 from the construction loan to the second mortgage proceeds of $31,000 results in a total of $54,000, more than sufficient to pay all that was owed to the subcontractors, suppliers and plaintiff. Yet rather than pay plaintiff in full as promised, the debtors chose to pay amounts owing on their first mortgage, a previously undisclosed obligation to Mr. Knight's mother, and other miscellaneous expenses in connection with their home.

Moreover, it is worth noting in this regard that the debtors' statement of financial affairs indicates that their joint income in 2004 was $156,422 for a family of four. This level of income suggests to the court that the debtors could have made up any alleged shortfall of the second mortgage from their current income if they sincerely desired to pay the plaintiff. Their failure to do so, combined with all of the other facts of this case, firmly convinces this court that the debtors never intended to pay plaintiff the full amount owed to it as exhibited in the April 6, 2004 note.

### III.

An order will be entered in accordance with the foregoing determining that the obligation owed by the debtors to the plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2).

# # #